# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS
## KANSAS CITY DIVISION

| | |
|---|---|
| VISHAL SHAH, on behalf of himself and all others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>SELECTQUOTE INSURANCE SERVICES and SELECTQUOTE INC.<br><br>                Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **18 U.S.C. § 2511(1)** *et seq.*<br>2. **INTRUSION UPON SECLUSION**<br>3. **UNJUST ENRICHMENT**<br>4. **CAL. PENAL CODE § 630,** *et seq.*<br>5. **CAL. CONST. ART. 1 § 1**<br>6. **BUS. & PROF. CODE § 17200**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Vishal Shah ("Plaintiff") brings this class action complaint on behalf of himself and all others similarly situated ("Class Members") against SelectQuote Insurance Services and SelectQuote Inc. (collectively "SelectQuote" or "Defendant") and alleges, upon personal knowledge as to his own actions and experiences, counsel's investigation, and upon information and good faith belief as to all other matters, as follows.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought to address SelectQuote's improper and illegal disclosure of consumers' personally identifiable information ("PII") and/or protected health information ("PHI") (collectively referred to as "Private Information") to Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta") and other third parties via www.selectquote.com ("Website").

2.      Information about a person's physical, mental, and financial health is among the most confidential and sensitive information in our society, and the mishandling of such information can have serious consequences, including discrimination in the workplace or denial of insurance coverage.

3.      SelectQuote owns and controls www.selectquote.com, and it intentionally installed a tracking pixel (the "Facebook Tracking Pixel" or "Pixel") on the Website to surreptitiously duplicate and send users' private communications to Facebook, the contents of which include Private Information and protected PHI/individually identifiable medical information.

4.      By installing, programming, and controlling the Pixel as described herein, Defendant aided, agreed, employed, and conspired with Facebook to intercept Plaintiff's and Class Members' sensitive and private communications without their knowledge or consent.

5.      A pixel is a piece of code that "tracks the people and [the] type of actions they take"[1] as they interact with a website, including which buttons a person clicks, which pages they view, and the exact text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), among other things.

---

[1] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Feb. 17, 2023).

6.      Pixels are routinely used to target specific customers by utilizing data to build profiles for retargeting and future marketing. Upon information and belief, Defendant utilized the Pixel data for marketing and retargeting purposes in an effort to bolster its profits.

7.      Correspondingly, Defendant exploits the Private Information Plaintiff and Class Members communicated to Defendant while seeking insurance coverage and uses it to create detailed profiles, allowing Facebook and Defendant to deliver targeted advertisements to particular individuals.

8.      Defendant's website, and more specifically its source code, manipulated Plaintiff's and Class Members' web browsers so that their communications with Defendant were automatically, contemporaneously, jointly, and surreptitiously sent to Facebook—an unintended third-party recipient.

9.      This is the functional equivalent of placing a bug or listening device on a phone line because Defendant's website allows third parties to "listen in" and receive communications in real time that Plaintiff intended only for Defendant.

10.     Importantly, Facebook would not receive these communications but for Defendant's installation and implementation of the Pixel.

11.     In addition to the Facebook Pixel, Defendant also installed and implemented Facebook's Conversions Application Programming Interface ("Conversions API" or "CAPI") on its Website servers.[2]

12.     Unlike the Facebook Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, Conversions API does not cause the user's browser to transmit information directly to Facebook. Instead, Conversions API tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers. [3,4] Indeed,

---

[2]      "CAPI works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited: January 25, 2023).

[3]      https://revealbot.com/blog/facebook-conversions-api/ (last visited: January 24, 2023).

[4]      "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited: January 27, 2023).

Facebook markets Conversions API as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[5]

13.     Because Conversions API is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Pixel from sending website users' Private Information to Facebook directly.

14.     Plaintiff and Class members reasonably believed that Defendant would maintain the confidentiality of their Private Information and not share such information with Facebook, a social media giant with a track record of disregarding privacy rights.

15.     As further alleged herein, Plaintiffs and Class members were harmed by Defendant's conduct and seek relief to redress these harms.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction over this action pursuant to 28 U.S.C § 1332(d)(2)(A) as modified by the Class Action Fairness Act of 2005 because at least one member of the Class, as defined herein, is a citizen of a different state than SelectQuote, there are more than 100 member of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

17.     This Court has personal jurisdiction over SelectQuote Insurance Services and SelectQuote Inc. because their headquarters is located in Overland Park, Kansas.

18.     Venue is proper in this District pursuant to 28 U.S.C § 1391 because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

## THE PARTIES

### *Plaintiff Vishal Shah*

19.     Plaintiff Shah is an adult citizen of the state of California and is domiciled in Buena Park, California.

---

[5]     https://www.facebook.com/business/help/2041148702652965?id=818859032317965     (last visited: January 28, 2023).

20.     In or about August 2023, Plaintiff Shah accessed www.selectquote.com from his mobile device and personal computer and used the website to search for life insurance quotes.

21.     In doing so, Plaintiff provided SelectQuote with his private, PII and health information in exchange for, and in order to receive SelectQuote's services.

22.     Plaintiff reasonably expected that his communications with SelectQuote via its Website were confidential, solely between himself and SelectQuote, and that such communications would not be transmitted to or intercepted by a third party such as Facebook.

23.     Plaintiff Shah has an active Facebook account he regularly accesses using his mobile device and personal computer. As described herein, SelectQuote sent his sensitive and private PII and confidential health information to third parties, including Facebook, when he accessed SelectQuote's website. Additionally, the information SelectQuote sent to third parties was linked to Plaintiff's Facebook ID.

24.     Pursuant to the systematic process described herein, SelectQuote assisted third parties, including Facebook, with intercepting Plaintiff's communications, including those that contained PII, protected health information, and related confidential information.

25.     This would not have occurred but for SelectQuotes use of the Facebook Pixel and related Facebook Business tools.

26.     SelectQuote assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.

27.     By failing to receive the requisite consent, SelectQuote breached confidentiality and unlawfully disclosed Plaintiff's personal, private, and personally identifiable information and protected health information.

### *Defendants*

28.     Defendant SelectQuote Insurance Services is a California corporation with its principal place of business located at 6800 W. 115th Street, Suite 2511, Overland Park, Kansas.

29.     Defendant SelectQuote Inc. is a Delaware corporation with it principal place of business at 6800 W. 115th Street, Suite 2111, Overland Park, Kansas.

30.     SelectQuote employs approximately 4,186 individuals, and its consolidated revenue for the fiscal year of 2023 is over $1 billion. Defendant owns, controls, and operates selectquote.com and life.selectquote.com, which is used throughout the United States.

**FACTUAL ALLEGATIONS**

**A.     Statutory Background**

31.     The California Invasion of Privacy Act ("CIPA") prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

32.     To establish liability under CIPA Section 637.1(a), Plaintiff need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

33.     Violations of CIPA are not limited to phone lines, but also apply to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking*

*Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history). Indeed, the Facebook Pixel was recently examined by the Northern District of California with the district court concluding that the plaintiff were likely to succeed on the merits with respect to both CIPA and the analogous Federal Wiretap Act. *See In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *11, 13 (N.D. Cal. Dec. 22, 2022).

34.     CIPA affords a private right of action to any person who has been subjected to a violation of the statute to seek injunctive relief and statutory damages of $5,000 per violation, regardless as to whether they suffered actual damages. Cal. Penal Code § 637.2.

35.     The Electronic Communications Privacy Act ("ECPA") is the federal analog to CIPA and, among other things, prohibits the intentional interception of the contents of any electronic communication. 18 U.S.C. § 2511.

**B.      Defendant's Website and The Underlying Technology Employed by Defendant for the Purpose of Disclosing Plaintiff's and Class Members' Private Information to Facebook.**

36.     Defendant's Website, www.selectquote.com, is accessible on mobile devices and desktop computers and gives consumers the option to search for and obtain life insurance policies, in large part based on the consumers' personal information and medical information.

37.     In order to use Defendant's online services, consumers must provide Defendant, at a minimum, the following information:

a.   Consumers' names, zip code, full address, and phone number;

b.   Gender and age;

c.   Health condition;

d.   Use of tobacco products;

e.   Annual pre-tax income;

f.   History of traffic violations;

g.   Remaining debt or mortgage; and,

38.     As a result, consumers communicate PII and protected health information via the Website, including private and confidential information regarding their health.

39.     Defendant purposely installed the Pixel on its website and programmed specific webpage(s) to surreptitiously share its users' private and protected communications with Facebook, including Plaintiff's and Class Members' Private Information.

40.     The Pixel tracks users as they navigate through the Website and simultaneously transmits to Facebook each users' communications including which pages are visited, which buttons are clicked, and other information including a user's IP address.[6] An IP address is a unique number assigned to an internet-enabled device that informs websites of the device's city, zip code, and physical location.

41.     As a result, consumers communicate PII and protected health information via the site, including private and confidential information regarding their physical and financial health.

42.     Notably, while consumers are filling out online forms and selecting options on SelectQuote's website, and supplying the information described above, SelectQuote, without the consumers' knowledge or consent, supplies the private and confidential information to non-party Facebook.

43.     If the consumer is also a Facebook user, the information Facebook receives is linked to the user's Facebook profile (via their Facebook ID or "c_user id"), which includes other identifying information.

44.     As explained herein, this information is collected not just by SelectQuote but also by Facebook because the embedded Pixel simultaneously transmits all the information SelectQuote receives, sending it to Facebook. If the consumer is also a Facebook user, Facebook in turn links the information they receive to the visitor's Facebook profile, which includes other identifying information.

45.     Plaintiff and Class Members did not and could not anticipate that Defendant would aid and conspire with Facebook to intercept and transmit their communications.

46.     However, consumers who fill out an insurance quote form and provide their private, personal and medical information are not notified of SelectQuote's Privacy Policy or its Cookies and

---

[6] https://developers.facebook.com/docs/meta-pixel/

Other Tracking Technologies Notice, and are not otherwise notified, that their online communications will be shared with third parties.

### 1.  Facebook's Business Tools and the Pixel

47.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[7]

48.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

49.     Facebook's Business Tools, including the Pixel and Conversion API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of website visitors' activity.

50.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[8] Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event." [9]

51.     One such Business Tool is the Pixel which "tracks the people and type of actions they take."[10] When a user accesses webpage(s) hosting the Pixel, their communications with the host webpage

---

[7] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[8] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142. (last visited Nov. 14, 2022); see FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Nov. 14, 2022).

[9] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBPAGE(S) EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; see also FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/. (last visited Nov. 14, 2022)

[10] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

are instantaneously and surreptitiously duplicated and sent to Facebook's servers. Notably, this transmission does not occur unless the webpage contains the Pixel. Stated differently, each Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook but for the Defendant's decisions to install the Pixel on its webpage(s).

52.     As explained in more detail below, this second simultaneous secret transmission is initiated by Defendant's source code concurrently with Plaintiff's and Class Members' communications to their intended recipient, Defendant.

53.     An example illustrates the point: An individual navigates to SelectQuote's website and clicks on the "Get a Quote" button. When the button is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because SelectQuote utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Facebook causes the browser to secretly duplicate the communication with SelectQuote, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

### 2.      Defendant's Pixel, Source Code, and Interception of HTTP Requests

54.     Web browsers are software applications that allow consumers to navigate the web and exchange electronic communications over the internet, and every "client device" (computer, tablet, or smart phone) has a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

55.     Correspondingly, every website is hosted by a computer "server" which allows the website's owner (Defendant) to exchange communications with the website's visitors (Plaintiff and Class Members) via the visitors' web browser.

56.     When a consumer uses Defendant's website and undertakes various actions, the consumer and Defendant are engaged in an ongoing back-and-forth exchange of electronic communications taking place via the consumer's web browser and Defendant's computer server.

57.     These communications are invisible to ordinary consumers because they consist of HTTP Requests and HTTP Responses, and one browsing session may consist of thousands of individual HTTP Requests and HTTP Responses.[11]

- **HTTP Request:** an electronic communication sent from the website visitor's browser to the website's corresponding server. In addition to specifying a particular URL (i.e., web address), "GET" HTTP Requests can also send data to the host server, including cookies. A cookie is a small text file that can be used to store information on the client device which can later be communicated to a server or servers.  Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response:** an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

58.     A consumer's HTTP Request essentially asks the Defendant's website to retrieve certain information, and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the user's screen as they navigate Defendant's Webpage(s)).

59.     Every webpage is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

60.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant's Pixel is source code that does just that. The Pixel acts much like a traditional wiretap. When users visit Defendant's website via an HTTP Request to SelectQuote's server, Defendant's server sends an HTTP Response including the Markup that displays the Webpage visible to the user and Source Code including Defendant's Pixel. Thus, Defendant is in essence handing users a tapped phone, and once

---

[11] See HHS Bulletin § *What is a tracking technology?* ("Tracking technologies collect information and track users in various ways, many of which are not apparent to the website or mobile app user.")

the Webpage is loaded into the user's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third-parties, including Facebook and Google.

61.     Third parties, like Facebook, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the user associated with the Personal Information intercepted.

62.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Personal Information, like Facebook, implement workarounds that savvy users cannot evade.  Facebook's workaround, for example, is called Conversions API. Conversions API is an effective workaround because it does the transmission from their own servers and does not rely on the user's web browsers. Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]." Thus, the communications between users and Defendant, which are necessary to use Defendant's Website, are actually received by Defendant and stored on its server before Conversions API collects and sends the Private Information contained in those communications directly from Defendant to Facebook. User devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

63.     While there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like Conversions API without access to the host server, companies like Facebook instruct Defendant to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook] that the pixel may lose."  Thus, it is reasonable to infer that Facebook's customers who implement the Facebook Pixel in accordance with Facebook's documentation will also implement the Conversions API workaround.

64.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these

third parties are typically procured to track user data and communications for marketing purposes of the website owner (i.e., to bolster profits).

65.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

66.     In this case, Defendant employed the Tracking Pixel and Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook.

67.     For example, when a user visits www.selectquote.com, and clicks the "Get a Quote" link, the user's web browser automatically sends an HTTP Request to Defendant's web server. The Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage as depicted in the image below.



**Figure 1. A consumer starts the process by clicking the "Get a Quote" button.**

68.     The image above represents the Markup for this particular webpage, and it is the only thing the user sees or is aware of when they view and interact with this particular webpage. The user does not see the Defendant's Source Code, or any HTTP Requests sent in the "background" while the webpage is operating.   In fact, this unseen Source Code manipulated users' browsers by secretly including Pixel code in the webpage's Source Code, which was programmed to silently monitor and

report the user's activity.  When the webpage loads into the user's browser, the Pixel code is triggered which sends an HTTP Request to Facebook including the user's c_user id and the URL, informing Facebook that the user is applying for life insurance on Defendant's website.

69.     Thereafter, when an event triggers the Pixel code, the code instructs the web browser to duplicate user communications (HTTP Requests) intended for Defendant and to send those communications to Facebook at the same time they are sent to Defendant.  This occurs because the Pixel that was embedded in Defendant's Source Code is programmed to automatically track and transmit a user's communications, and this occurs contemporaneously, invisibly, and without the user's knowledge.

70.     The images below demonstrate how communications between consumers and SelectQuote are collected and sent to third parties, such as Facebook. In Figure 1, above, a consumer visits SelectQuote's website and selects the "Get a Quote" button.

71.     Figure 2, below, demonstrates that after selecting the "Get a Quote" button, consumers are required to answer multiple questions about their personal, medical, and financial condition.





COMPLAINT

Speak to a licensed insurance agent 📞 **1-833-580-4668**

⭕ SELECTQUOTE
We shop. You save.

### What is your annual individual income? (optional)

| | |
|---|---|
| $0 - $24,999 | $25,000 - $49,999 |
| $50,000 - $74,999 | $75,000 - $99,999 |
| $100,000 - $149,999 | $150,000 - $249,999 |
| $250,000 or greater | |

Back    **Next**

Privacy Policy | Legal | Disclosures | Accessibility

Licensed name varies by state. SelectQuote Insurance Services. SelectQuote Insurance Agency. ©2023 SelectQuote Insurance Services. All rights reserved.

---

Speak to a licensed insurance agent 📞 **1-833-580-4668**



### Did your parents or siblings have heart disease, cancer, stroke, or diabetes before age 65?

Yes

No

Back    **Next**

Privacy Policy | Legal | Disclosures | Accessibility

Licensed name varies by state. SelectQuote Insurance Services. SelectQuote Insurance Agency. ©2023 SelectQuote Insurance Services. All rights reserved.

COMPLAINT



**Figure 2. Consumers are required to answer questions regarding their personal information.**

72.     Once consumers submit their answers to the questions exemplified above (and other questions), their answers are automatically sent to Facebook.

73.     For instance, as shown in the image below, any information clicked by a consumer on Defendant's Website would be contemporaneously shared with Facebook as that information was being sent to Defendant's servers.

74.     At the same time, Conversions API causes the user's communications to be sent to and stored on Defendant's servers, to be later communicated to Facebook from Defendant itself rather than from a Website user's web browser.[12]

---

[12] Facebook has tools to de-duplicate communications sent by the Pixel and Conversions API so that only one copy of any particular communication is sent to it.

- **cookies:**
  - **sb:** orLgYBZ5RLlXKOatKIJB_8DB
  - **datr:** orLgYHbB6R27lrTh3PDCitEr
  - **c_user:** ██████████
  - **x-referer:**
    eyJyIjoiL2llc3NhZ2VzL3JlYWQvP3RpZD1jaWQuZy4xNDk00DgwODEwNjAwNTM1JmVudHJ5cG9pbnQ9amV3ZWwwmc3VyZmFjZV9oaWVyYXJjaHk9dW5rbg
  - **usida:** eyJ2ZXIi0jEsImlkIjoiQXJtancwcjE5bWMzMXEiLCJ0aW1lIjoxMjc0O01wNDY2fX0==
  - **xs:** 25:WK5eRJPbQecVVw:2:1625338574:-1:3021::AcUvV3U9kGqY7qj00QJV52rGF9mnJ2uDDBWq2f-cfZQj
  - **fr:** 00qKiQXOxR77JOn8N.AWVsar7wiZEKnoD3poMRJ_silEE.Bjwjyy.Qy.AAA.0.0.Bjwjyy.AWXQwoMvNxM
- **headersSize:** -1
- **bodySize:** 4198
- **postData:**
  - **mimeType:** application/x-www-form-urlencoded
  - **text:** id=1741729689333076&ev=SubscribedButtonClick&dl=https://life.selectquote.com/quote-form/step-8/&rl=https://life.
    form/step-7/&if=false&ts=1674253718522&cd[buttonFeatures]=
    {"classList":"frm_label_button_container","destination":"https://life.selectquote.com/quote-form/step-
    8/","id":"","imageUrl":"","innerText":"Cancer","numChildButtons":0,"tag":"div","type":null}&cd[buttonText]=Cancer&cd
    [{"id":"","name":"frm_action","tag":"input","inputType":"hidden"},{"id":"","name":"form_id","tag":"input","inputType
    {"id":"","name":"frm_hide_fields_58","name":"frm_hide_fields_58","tag":"input","inputType":"hidden","valueMeaning":"empty"},
    {"id":"","name":"form_key","tag":"input","inputType":"hidden"},
    {"id":"","name":"item_meta[0]","tag":"input","inputType":"hidden","valueMeaning":"empty"},
    {"id":"","name":"frm_submit_entry_58","name":"frm_submit_entry_58","tag":"input","inputType":"hidden"},
    {"id":"","name":"_wp_http_referer","tag":"input","inputType":"hidden"},{"id":"field_pr7dfd5db9b9a-0","name":"item_me
    []","tag":"input","inputType":"checkbox"},{"id":"field_pr7dfd5db9b9a-1","name":"item_meta[2045][]","tag":"input","inp
    {"id":"field_pr7dfd5db9b9a-2","name":"item_meta[2045][]","tag":"input","inputType":"checkbox"},{"id":"field_pr7dfd5d
    3","name":"item_meta[2045][]","tag":"input","inputType":"checkbox"},{"id":"field_pr7dfd5db9b9a-4","name":"item_meta[
    []","tag":"input","inputType":"checkbox"},{"id":"field_pr7dfd5db9b9a-5","name":"item_meta[2045][]","tag":"input","inp
    {"id":"field_pr7dfd5db9b9a-6","name":"item_meta[2045][]","tag":"input","inputType":"checkbox"},{"id":"field_pr7dfd5d
    7","name":"item_meta[2045][]","tag":"input","inputType":"checkbox"},{"id":"field_pr7dfd5db9b9a-8","name":"item_meta[
    []","tag":"input","inputType":"checkbox"},{"id":"field_pr7dfd5db9b9a-9","name":"item_meta[2045][]","tag":"input","inp
    {"id":"field_bh7ve43288008005da60b02f0","name":"item_meta[2046]","tag":"input","inputType":"hidden"},
    {"id":"field_atha9bb958f1af8","name":"item_meta[2047]","tag":"input","inputType":"text"},
    {"id":"field_bwm7l","name":"item_meta[2191]","tag":"input","inputType":"hidden"},
    {"id":"","name":"item_key","tag":"input","inputType":"hidden","valueMeaning":"empty"},
    {"id":"","name":"frm_state","tag":"input","inputType":"hidden"},{"id":"","name":"","tag":"button"}]&cd[pageFeatures]=
    {"title":"Life+Insurance+|+Get+Free+Life+Insurance+Quotes+Today"}&sw=1440&sh=900&udff[st]=0a2f133eb9f7ca028a20aa3fcd7
    5.9.5-3.0.6&ec=2&o=2078&cs_est=true&fbp=fb.1.1674253558483.1183319565&it=1674253713192&coo=false&es=automatic&tm=3&ru
  - **id:** 1741729689333076

**Figure 3. Consumer's responses to personal questions are sent to third-parties, including but not limited to Facebook, via the Pixel.**

75.    The image above reflects that the consumer's selections from Defendant's answer options, was transmitted to Facebook by Defendant's Website, such as, the consumer's selection of "cancer" as one of their past medical conditions for which she received treatment.

76.    Thus, without its users' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" its users' computing devices, allowing Facebook and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

77.    Consequently, when Plaintiff and Class Members visit Defendant's website and communicate their Private Information, including, but not limited to, button clicks and page visits, that Private Information also is transmitted to Facebook.

**3.     Users Do Not Provide Informed Consent Before Their Information is Collected and Intercepted.**

78.     Defendant did not ask users, including Plaintiff, whether they consent to be wiretapped via the Pixel or to external sharing of their Private Information prior to submitting their Personal Information to Defendant.   Users are never told that their electronic communications are being wiretapped via the Pixel.

79.     Defendant's written policies did not adequately disclose the wiretapping for multiple reasons.

80.     First, to the extent Defendant's home page contained links to its Privacy Policy, Terms of Use, or any other policies, they were buried at the very bottom of the webpage in small, inconspicuous font that was designed to be unobtrusive and easy to overlook. Visitors to the website are given no notice and are not prompted to take any affirmative action to demonstrate assent prior to providing their Private Information to Defendant.

81.     Second, after a user enters their Private Information onto Defendant's web form, Defendant did not provide a click-through or clickwrap process that presented users with its Terms of Use, Privacy Policy, Consumer Privacy Notice, or the Cookie and Other Tracking Technologies Notice. While users may have been presented with hyperlinks to certain other notices through a clickwrap process, the foregoing notices were absent.

82.     As such, users who fill out the questionnaires on SelectQuote's website and provide their personally identifiable information, private communications, and protected health information are not informed that SelectQuote will track and share their private information and communications with third parties. And users, like Plaintiff, never agree or are never given the option to agree to any such Privacy Policy when using the website.

**4.     Plaintiff's and Class Members' Private Communications to Defendant were Linked to their Individual Facebook Profiles and Unique Identifiers.**

83.     The information that Defendant's Pixel sent to Facebook was transmitted alongside other information that reveals a particular user's identity.

84.     Every Facebook user has a unique and persistent Facebook ID ("FID") that is associated with their Facebook profile and individual account, and Facebook places a cookie containing the user's FID ("c_user" cookie) on their device when they log into Facebook. With it, anyone can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect it to the corresponding Facebook profile.

85.     The FID is categorized as a third-party cookie, and it identifies a particular person and their actions or communications with a website, such as Defendant's Website, if, and only if, the owner of that website has installed the Facebook Pixel.

86.     Facebook provides the Pixel code to companies to embed on their own websites, and upon doing so, the Pixel causes the website to operate much like a traditional wiretap that begins "listening in" as soon as the website loads.

87.     Thus, the Pixel was triggered each time Plaintiff and Class Members communicated with Defendant via www.SelectQuote.com (in the form of HTTP Requests to Defendant's web server). Upon triggering of the Pixel, the Website user's communications were intercepted, duplicated, and secretly transmitted to Facebook at the same time the message is dispatched to Defendant. Thus, two communications originate from a user's browser once the user initiates an action on the webpage: one, as intended, to Defendant, and a second, undetectable to the user, is simultaneously sent to Facebook. Accordingly, at the same time the user's browser dispatches a GET Request to Defendant, it sends a duplicate to Facebook.

88.     Plaintiff and Class Members were unaware this was happening, and Defendant did not inform them that Private Information communicated via Defendant's Website would be shared with Facebook or other third-parties.

89.     SelectQuote does not share anonymized data with third parties, but instead shares PII and/or health information tied to unique identifiers that are tied to the specific user.

90.     SelectQuote does not disclose to visitors to its website that it shares their PII and/or health information and related communications with Facebook, or any other third party.

91.     SelectQuote benefits from the unauthorized sharing with third parties of Plaintiff's and Class Members' personal information, health related information, and private communications. By using the software development kits ("SDK") from Facebook and providing Plaintiff's and Class Members' personal and private information and communications to Facebook, SelectQuote improves its advertising abilities, and benefits financially from advertising its services through third parties.

**C.     Facebook Exploited and Used Plaintiff's and Class Members' Private Information**

92.     Unsurprisingly, Facebook does not offer its Pixel to companies like Defendant solely for Defendant's benefit. "Data is the new oil of the digital economy,"[13] and Facebook has built its more-than $300 billion market capitalization on mining and using that "digital" oil. Thus, the large volumes of personal and sensitive health-related data Defendant provides to Facebook are actively examined, curated, and put to use by the company. Facebook acquires the raw data to transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. Indeed, Facebook offers the Pixel free of charge[14] and the price that Defendant pays for the pixel is the data that it allows Facebook to collect.

93.     Facebook describes itself as a "real identity platform,"[15] meaning users are allowed only one account and must share "the name they go by in everyday life."[16]  To that end, when creating an account, users must provide their first and last name, date of birth, and gender.[17]

94.     Facebook sells advertising space by emphasizing its ability to target users.[18]  Facebook is especially effective at targeting users because it surveils user activity both on and off its site (with the

---

[13] https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/ (last visited Jan. 18, 2023).

[14] https://seodigitalgroup.com/facebook-pixel/

[15] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[16] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[17] FACEBOOK, SIGN UP, https://www.facebook.com/

[18] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

help of companies like Defendant).[19]  This allows Facebook to make inferences about users beyond what they explicitly disclose, including their "interests," "behavior," and "connections."[20]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[21]

95.    Advertisers can also build "Custom Audiences,"[22] which helps them reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[23]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[24]  Unlike Core Audiences, Custom Audiences and Lookalike Audiences are only available if the advertiser has sent its underlying data to Facebook. This data can be supplied to Facebook by manually uploading contact information for customers or by utilizing Facebook's "Business Tools."[25]

96.    The Facebook Pixel, and the personal data mined and curated with it, is key to this business.  As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[26]

---

[19] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[20] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[21] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[22] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[23] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[24] Facebook, About Lookalike Audiences,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[25] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[26] FACEBOOK, THE FACEBOOK BUSINESS TOOLS,
https://www.facebook.com/help/331509497253087.

97.     Facebook does not merely collect information gathered by the Pixel and store it for safekeeping on its servers without ever accessing the information. Instead, in accordance with the purpose of the Pixel to allow Facebook to create Core, Custom, and Lookalike Audiences for advertising and marketing purposes, Facebook viewed, processed, and analyzed Plaintiff's and Class Members' confidential Private Information. Upon information and belief, such viewing, processing, and analyzing was performed by computers and/or algorithms programmed and designed by Facebook employees at the direction and behest of Facebook.

98.     Facebook receives over 4 petabytes of information every day and must rely on analytical tools designed to view, categorize, and extrapolate the data to augment human effort.[27] This process is known as data ingestion and allows "businesses to manage and make sense of large amounts of data."[28]

99.     By using these tools, Facebook is able to rapidly translate the information it receives from the Pixel in order to display relevant ads to consumers. For example, if a consumer visits a retailer's webpage and places an item in their shopping cart without purchasing it, the next time the shopper visits Facebook, an ad for that item will appear on the shopper's Facebook page.[29] This evidences that Facebook views and categorizes data as they are received from the Pixel.

100.    Moreover, even if Facebook eventually deletes or anonymizes sensitive information that it receives, it must first view that information in order to identify it as containing sensitive information suitable for removal. Accordingly, there is a breach of confidentiality once the information is disclosed or received without authorization.

### D.      Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures and Plaintiff's and Class Members' Data and Private Information Had Financial Value

101.    The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and Class Members' Private Information was to commit tortious acts as alleged herein, namely, the use of Private Information for advertising in the absence of express written consent.

---

[27] https://medium.com/@srank2000/how-facebook-handles-the-4-petabyte-of-data-generated-per-day-ab86877956f4
[28] https://scaleyourapp.com/what-database-does-facebook-use-a-1000-feet-deep-dive/
[29] https://www.oberlo.com/blog/facebook-pixel

Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was an invasion of privacy.

102.    In exchange for disclosing the Private Information of its users, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on its platform.

103.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted customers and potential customers.

104.    Upon information and belief, Defendant was advertising its services on Facebook, and the Pixel was used to help Defendant understand the success of its advertisement efforts on Facebook. Defendant, in coordination with Facebook, associated Plaintiff's and Class Members' Personal Information with preexisting Facebook user profiles.

105.    By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

106.    Defendant's disclosure of Private Information also hurt Plaintiff and the Class. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

107.    The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[30]

108.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[31]

---

[30] *See* https://time.com/4588104/medical-data-industry/ (last visited February 16, 2023).
[31] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited February 16, 2023).

109.    Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[32]

110.    There is also a market for data in which consumers can participate.  Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

111.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[33,34] And consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[35]

112.    Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

113.    Meta itself has paid users for their digital information, including browsing history. Until 2019, Meta ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

---

[32] Vero, How to Collect Emails Addresses on Twitter (June 2014), available at https://www.getvero.com/resources/twitter-lead-generation-cards/.

[33] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[34] https://datacoup.com/

[35] https://digi.me/what-is-digime/

114.     Additionally, healthcare data may be valued at up to $250 per record on the black market.[36]

**TOLLING OF THE STATUTE OF LIMITATIONS AND DELAYED DISCOVERY**

115.     All applicable statute(s) of limitations have been tolled by the delayed discovery doctrine. Plaintiff and Class Members could not have reasonably discovered Facebook's practice of tracking and intercepting their activities and communications on Defendant's website until this class action litigation commenced.

116.     Plaintiff did not learn of Facebook's intercepting their activities and communications on Defendant's website until being informed by the undersigned counsel of record shortly before this complaint was filed.

117.     Plaintiff had no reason to believe his Private Information was being intercepted through Defendant's website at all, let alone in real time while Plaintiff was inputting information into Defendant's website but before Plaintiff submitted his application.  As detailed above, Defendant's privacy policy hyperlinks were buried on the bottom of Defendant's homepage, and Plaintiff was not presented with a conspicuous clickwrap listing the privacy policy hyperlinks. Furthermore, the technologies Defendant embedded on its website are not visible to the reasonable user—they are invisible and work in the background.

118.     As a result, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**CLASS ACTION ALLEGATIONS**

119.     **Class Definition:** Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as:

  a.  All persons in California who, during the class period, provided their personally identifiable information and/or health information to SelectQuote via its Website (the "California Class").

---

[36] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

b.  All persons in the United States who, during the class period, provided their personally identifiable information and/or health information to SelectQuote via its Website (the "Nationwide Class") (together, with the California Class, the "Class")

120.    Plaintiff reserves the right to modify the class definitions or add sub-classes as necessary prior to filing a motion for class certification, at class certification, or at any later time as the Court permits.

121.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

122.    Excluded from the Class is SelectQuote; any affiliate, parent, or subsidiary of SelectQuote; any entity in which SelectQuote has a controlling interest; any officer director, or employee of SelectQuote; any successor or assign of SelectQuote; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

123.    <u>Numerosity/Ascertainability</u>. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from SelectQuote's records and non-parties' records.

124.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class because Plaintiff used www.selectquote.com and had his Private Information disclosed to third parties without his express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

125.    <u>Adequacy</u>. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation

specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

126.   <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest</u>. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  The following questions of law and fact are common to the Class:

a.   Whether Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances;

b.   Whether Defendant's website surreptitiously records personally identifiable information, protected health information, financial information, and related communications and subsequently, or simultaneously, discloses that information to third parties;

c.   Whether Defendant disseminated Class Members' confidential communications to third parties;

d.   Whether SelectQuote's conduct resulted in a breach of confidentiality;

e.   Whether SelectQuote violated Plaintiff's and Class Members' privacy rights by using software to record and communicate website visitor's personally identifiable information, including unique identifies and FIDs, alongside confidential medical communications;

f.   Whether Plaintiff and Class Members are entitled to damages under CIPA, ECPA, or any other relevant statute;

g.   Whether Defendant's actions violate Plaintiff's and Class Members' privacy rights as provided by the California Constitution; and

h.   Whether Defendant's actions violated California's Unfair Competition Law, Bus. and Prof. Code § 17200 *et seq.* by, among other things, surreptitiously recording personally identifiable information, protected health information, financial information, and related communications and subsequently, or simultaneously, disclosing that information to third parties.

127.   <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of the Electronic Communications Privacy Act**
**(18 U.S.C. § 2511(1)) ("ECPA")**

128.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

129.   The ECPA protects both the sending and receipt of communications.

130.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

131.   A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

132.   "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

133.    "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

134.    "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

135.    By utilizing and embedding the Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a). Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Pixel source code it embedded and ran on its Website, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiff's and Class Members' electronic communications without authorization or consent.

136.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to Facebook, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

137.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

138.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' Private Information for financial gain.

139.    Defendant was not acting under color of law to intercept Plaintiff's and the Class Members' wire or electronic communication.

140.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

141.   Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

142.   Unauthorized Purpose – Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy. The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

143.   Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) (an entity's simultaneous, unknown duplication and forwarding of GET requests made to a web page's server does not qualify for the party exemption, because holding otherwise "would render permissible the most common methods of intrusion, allowing the exception to swallow the rule"). However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information does not qualify for the party exemption.

144.   Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and the Class Members' communications about their Private Information on its Website, because it used its participation in these communications to improperly share Plaintiff's and the Class Members' information with Facebook, a third-party that did not participate in these communications, that Plaintiff and the Class Members did not know was receiving their Private Information, and that Plaintiff and the Class Members did not consent to receive this information.

145.   As a result of Defendant's violation of the ECPA, Plaintiff is entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**SECOND CAUSE OF ACTION**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**

146.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the Proposed Class.

147.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its website and the communications platforms and services therein.

148.    Plaintiff and Class Members communicated sensitive and protected medical information and personally identifiable information that they intended for only Defendant to receive and that they believed Defendant would keep private.

149.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

150.    Plaintiff and Class Members had a reasonable expectation of privacy based on the sensitive nature of their communications. Plaintiff and Class Members have a general expectation that their communications regarding health and finances will be kept confidential. Defendant's disclosure of Private Information coupled with individually identifying information is highly offensive to the reasonable person.

151.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

152.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

153.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

154.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

155.    Plaintiff also seeks such other relief as the Court may deem just and proper.

### THIRD CAUSE OF ACTION
**Unjust Enrichment/Quasi-Contract**

156.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

157.    Plaintiff and Class Members retain a stake in the profits garnered from their Private Information because the circumstances are such that, as between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand, it is unjust for Defendant to retain these profits.

158.    By intercepting (and facilitating interception), disclosing, and using for targeted advertising Plaintiff's and Class Members' Private Information and bundled with their other personal information, without their permission, Defendant generated revenues and was unjustly enriched at the expense of Plaintiff and the Class.

159.    It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation it obtained from using Plaintiff's and Class Members' Private Information bundled with their Facebook ID for targeted advertising.

160.    Plaintiff and the Class Members seek an order from this Court requiring Defendant to disgorge all proceeds, profits, benefits, and other compensation obtained by Defendant from its improper and unlawful interception (and facilitating interception), disclosure, and use of their Private Information for targeted advertising.

161.    Plaintiff and Class Members seek this equitable remedy because their legal remedies are inadequate.  An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

**FOURTH CAUSE OF ACTION**
**Violation Of the California Invasion of Privacy Act,**
**Cal. Penal Code § 630, *et seq***
**(California Class)**

162.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the California Class.

163.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

164.    California Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … [ii] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; [iii] or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

165.    A defendant must show it had the consent of <u>all</u> parties to a communication.

166.    Plaintiff's and Class Members' specific user input events and choices and information typed on Defendant's website are tracked by Defendant using the SDK provided by third parties, such as Facebook. The user's affirmative actions, such as inputting information, selecting options, or relaying a response, and constitute communications within the scope of CIPA.

167.    At all relevant times, Defendant aided, agreed with, and conspired with third parties, Facebook, to track and intercept Plaintiff's and Class Members' internet communications while accessing www.selectquote.com.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

168.   Defendant intentionally inserted an electronic device into its website that, without the knowledge and consent of Plaintiff and Class Members, tracked and transmitted the substance of their confidential communications with Defendant to a third party.

169.   Defendant willingly facilitated Facebook's interception and collection of Plaintiff's and Class Members' Private Information by embedding the Facebook Pixel on its website.

170.   Defendant intended to share Plaintiff and Class Members' private and personal information and communications to help the third parties learn some meaning of the content of the communications.

171.   Plaintiff and Class Members are residents of California, and used their devices within California. As such, Defendant records and disseminates Plaintiff's and Class Members' data, communications, and personal information in California.

172.   Plaintiff and Class Members did not consent to any of Defendant's actions in implementing the tracking software. Nor have Plaintiff or Class Members consented to Defendant's intentional collection and sharing of Plaintiff's and Class Members' electronic communications, personally identifiable information, medical information, or financial information.

173.   At all relevant times to this complaint, Plaintiff and the other Class Members did not know Defendant was engaging in such recording and sharing of information, and therefore could not provide consent to have any part of their private and confidential communications, personally identifiable information, financial information, and/or medical information intercepted and recorded by Defendant and thereafter transmitted to others.

174.   The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the software and SDK in the source code of SelectQuote's website, such as Facebook Tracking Pixel, falls under the broad catch-all category of "any other manner":

    a.   The computer codes and programs third parties, such as Facebook, used to track Plaintiff's and Class Members' communications while they were navigating www.selectquote.com;

    b.   Plaintiff's and Class Members' browsers;

    c.   Plaintiff's and Class Members' computing and mobile devices;

    d.   Facebook's web and ad servers;

    e.   The web and ad-servers from which third parties, including Facebook, tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.selectquote.com; and

    f.   The computer codes and programs used by third parties, including Facebook, to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's website.

175.    Defendant fails to disclose that it is using software from third parties, such as Facebook Pixel, specifically to track and automatically and simultaneously transmit communications, personally identifiable information, and protected health information to a third parties, *e.g.*, Facebook. Defendant is aware that these communications are confidential as its "Cookies and Other Tracking Technologies Notice" acknowledges the confidential nature of private medical information but fails to disclose to website visitors who submit an insurance quote that SelectQuote will record and provide their private and personal information with third parties.

176.    The private information that Defendant transmits while using third party software, such as Facebook Pixel, including medical information consumers enter into the website, IP addresses, phone numbers and home addresses constitute confidential protected health information and personally identifiable information.

177.    The Pixel is designed such that they transmit each of the users' actions taken on the webpage to a third party alongside and contemporaneously with the user initiating the communication. Thus, the communication is intercepted in transit to the intended recipient, Defendant, and before it reaches Defendant's server.

178.    As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties to receive its users' online communications through its website without their consent.

179.    As a direct and proximate result of Defendant's violation of the CIPA, Plaintiff and Class Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

180.     By disclosing Plaintiff's and Class Members' Private Information, Defendant violated Plaintiff's and Class Members' statutorily protected right to privacy.

181.     As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to each Plaintiff and Class Member for the greater of treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

182.     Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, and injunctive and declaratory relief.

## FIFTH CAUSE OF ACTION
### Invasion of Privacy Under California's Constitution
### (California Class)

183.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the California Class.

184.     The California Constitution recognizes the right to privacy inherent in all residents of the State and creates a private right of action against private entities that invade that right.

185.     Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

186.     The right to privacy was added to the California Constitution in 1972, through Proposition 11 (called the "Right to Privacy Initiative"). Proposition 11 was designed to codify the right to privacy, protecting individuals from invasions of privacy from both the government and private entities alike: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information." Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7,

1972), argument in favor of Prop. 11, p. 27; *see also Hill v. Colorado*,530 U.S. 703, 716 (2000) (the right to privacy includes right to be free in one's home from unwanted communication); *Hill v. National Collegiate Athletic Assn.* (1994), 7 Cal.4th 1, 81, (Mosk, J., dissenting).

187.    Plaintiff and Class Members have a legally protected privacy interests, as recognized by the California Constitution, CIPA, common law and the 4th Amendment to the United States Constitution.

188.    Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiff and Class Members were not aware and could not have reasonably expected that SelectQuote would surreptitiously install software on its website to automatically track and transmit to third parties each Plaintiff's and Class Members' personally identifiable information, confidential communications and medical information.

189.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information and financial information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

190.    At all relevant times, by using software, such as Facebook's Tracking Pixel, to record and communicate Plaintiff's and Class Members' personally identifiable information, including unique identifiers and FIDs alongside their confidential communications and medical information, SelectQuote intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

191.    Plaintiff and Class Members did not authorize SelectQuote to record and transmit to third parties Plaintiff's and Class Members' private communications alongside their personally identifiable information and health information.

192.    This invasion of privacy is serious in nature, scope, and impact because it relates to Plaintiff's and Class Members' private communications, personally identifiable information, and

medical information. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

193.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

194.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

195.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

196.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant's from engaging in such conduct in the future.

197.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**SIXTH CAUSE OF ACTION**
**Violation of the Unfair Competition Law – Unfair and Unlawful**
**(Cal. Bus. & Prof. Code § 17200, *et seq.*)**
**(California Class)**

198.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the California Class.

199.    California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

200.    Defendant engaged in unlawful business practices in connection with its disclosure of Plaintiff's and Class Members' Private Information to unrelated third parties, including Facebook, in violation of the UCL.

201.    The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

202.    Defendant violated the "unlawful" prong of the UCL by violating Plaintiff's and Class Members' constitutional rights to privacy and California Penal Code § 631(a).

203.    Defendant's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct, as alleged herein, offended public policy (including the aforementioned state privacy statutes and laws) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and Class Members.

204.    The harm caused by the Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein. There is no business justification for aiding and enabling the interception of confidential information without adequately informing users in advance.

205.    As a result of Defendant's violations of the UCL, Plaintiff and Class Members are entitled to injunctive relief. On information and belief, this is particularly true since the dissemination of Plaintiff's and Class Members information is ongoing.

206.    As result of Defendant's violations of the UCL, Plaintiff and Class Members have suffered injury in fact and lost money or property. The unauthorized access to Plaintiff's and Class Members' private and personal data has diminished the value of that information. Plaintiff and the Class also derive economic value from their PII and would not have provided it to Defendant or Facebook for marketing purposes in the absence of consideration for that use. Thus, Defendant prevented Plaintiff and the Class from capturing the full value of their Personal Information.

207.    In the alternative to those claims seeking remedies at law, Plaintiff and Class Members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendant's unlawful and unfair business practices. The legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the

remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future."). Additionally, unlike damages, the Court's discretion in fashioning equitable relief is very broad and can be awarded in situations where the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177-180 (2000) (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."). Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (2007) (noting that restitution is available even in situations where damages may not be available). Furthermore, the standard for a violation of the UCL "unfair" prong is different from the standard that governs legal claims.

208.     Therefore, Plaintiff and members of the proposed Class are entitled to equitable relief to restore Plaintiff and Class Members to position they would have been in had Defendants not engaged in unfair competition, including an order enjoining Defendant's wrongful conduct, restitution, and restitutionary disgorgement of all profits paid to Defendant as a result of its unlawful and unfair practices.

## RELIEF REQUESTED

209.     Plaintiff, on behalf of himself and the proposed Class, respectfully requests that the Court grant the following relief:

      a.  Determine that the claims alleged herein may be maintained as a class action and issue an order certifying the Class defined above;

      b.  Appoint Plaintiff as the representative of the Class and his counsel as Class counsel;

      c.  An order enjoining Defendant from engaging in the unlawful practices and illegal acts described herein;

      d.  An order awarding Plaintiff and the Class: (1) actual or statutory damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) equitable disgorgement and injunctive relief as pleaded or as the Court may deem proper; and (5) reasonable attorneys' fees and expenses and costs of suit pursuant to Cal. Code of Civil Procedure § 1021.5 and/or other applicable law; and

e.   Other such and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

210.   Plaintiff, on behalf of himself and the proposed Class, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: January 17, 2024                    Respectfully submitted,

_Maureen M. Brady_

_____
Maureen M. Brady KS #22460
Lucy McShane  KS #22517
**MCSHANE & BRADY, LLC**
200 Westport Rd., P.O. Box 10090
Kansas City, MO 64108
Telephone:  (816) 888-8010
Facsimile:  (816) 332-6295
mbrady@mcshanebradylaw.com
lmcshane@mcshanebradylaw.com

Daniel O. Herrera*
Mohammed A. Rathur*
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle Street, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
mrathur@caffertyclobes.com

**Attorneys for Plaintiff and the Putative Class**

*pro hac vice forthcoming*